IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 09-cv-01390-MSK-BNB

JANELL KENFIELD, f/k/a Janell Bezdek,

      Plaintiff,

v.

COLORADO DEPARTMENT OF PUBLIC HEALTH & ENVIRONMENT,

      Defendant.

_____

## OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
_____

**THIS MATTER** comes before the Court pursuant to the Defendant's Motion for

Summary Judgment **(# 102,** as supplemented **# 103, 104)**, the Plaintiff's response **(# 112)**, and

the Defendant's reply **(# 118)**.

## FACTS

With regard to this motion,  the Court considers all undisputed facts, and where disputed

construes them most favorably to the non-movant, here, the Ms. Kenfield.  The following are the

basic facts; the Court will elaborate as necessary in its analysis.

Ms. Kenfield, who is white, was employed by the Department of Public Health &

Environment ("the Department") as a Disease Intervention Specialist (sometimes "DIS"), and

was classified as a Health Professional III ("HP III").  For purposes of this case, Ms. Kenfield's

immediate supervisor (who occupied a HP V job classification) was initially Regina Charter, and

upon Ms. Charter's departure, Rebecca Jordan.  The HP V supervisors  were overseen by Althea

Bruce, whom Ms. Kenfield alleges is the person responsible for the alleged discrimination and retaliation in this case. Ms. Bruce's superior, the Section Chief of the Department, was Beth Dillon. Ms. Kenfield, Ms. Charter, Ms. Jordan, and Ms. Dillon are all white; Ms. Bruce is black.

On January 24, 2007, Ms. Kenfield filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Alleging race discrimination and retaliation, she raised three issues: (i) on or before April 27, 2006, her most recent performance evaluation had been downgraded from an overall rating of 3 (*i.e.* exceeds expectations), to an overall rating of 2 (*i.e.* meets expectations); (ii) on November 9, 2006, she was told that she would not be considered for a promotion to HP IV classification, even though she had already been performing the duties of that position; and (iii) after filing an internal complaint in November 2006, she was retaliated against by having duties and responsibilities taken away and given to a non-white co-worker.

On January 9, 2008, Ms. Kenfield filed a second charge of discrimination with the EEOC. This charge alleged discrimination on the basis of race and sex,[1] as well as retaliation, and listed what appear to be two additional instances of discrimination: (i) after filing her initial charge, she "continued to be harassed by having my duties reassigned" to her non-white co-worker, and that co-worker was given training opportunities and was "groomed for promotion" in ways that Ms. Kenfield was not; and (ii) in or about October 2007, the Department posted a vacancy for an HP V supervisor, and although Ms. Kenfield applied, she was given only a "perfunctory" interview and the position was given to her non-white co-worker.

In this action, Ms. Kenfield asserts claims for race discrimination and retaliation under

---

[1]Ms. Kenfield makes clear that she does not allege sex discrimination in the instant case.

2

Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, consistent with the allegations in her EEOC

charges. The Department seeks summary judgment **(# 102)** on those claims, arguing that Ms.

Kenfield cannot establish all the elements of either claim.

<u>**ANALYSIS**</u>

**A. Standard of review**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if

no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

Summary adjudication is authorized when there is no genuine dispute as to any material fact and

a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs

what facts are material and what issues must be determined. It also specifies the elements that

must be proved for a given claim or defense, sets the standard of proof and identifies the party

with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual

dispute is "genuine" and summary judgment is precluded if the evidence presented in support of

and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir.

2002).

If the moving party does not have the burden of proof at trial, it must point to an absence

of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.

If the respondent comes forward with sufficient competent evidence to establish a colorable

claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B.  Race discrimination

To establish a claim of race discrimination under Title VII, Ms. Kenfield must first make a *prima facie* showing that: (i) she belongs to a protected class; (ii) she suffered an adverse employment action; and (iii) that adverse employment action arose in circumstances giving rise to an inference of discrimination.  *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007).  If she establishes a *prima facie* case, the burden shifts to the Department to articulate a legitimate, non-discriminatory reason for the adverse action, and Ms. Kenfield has the ultimate burden of demonstrating that the Department's proffered reason is untrue and a pretext for discrimination. *Id.*

Because Ms. Kenfield is white, the Department contends that she is required to make a heightened showing in order to establish a *prima facie* case.  The 10th Circuit has repeatedly held that "a member of a historically favored group . . . may not rely on the traditional factors to establish a *prima facie* case by way of circumstantial evidence unless, in lieu of showing that [she] belongs to a protected group, [she] establishes background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority."  *Durant v. MillerCoors, LLC*, 415 Fed.Appx. 927, 931 (10th Cir. 2011) (unpublished), *quoting Notari v. Denver Water Dept.*, 971 F.2d 585, 589 (10th Cir. 1992). [2]

---

[2]This Court has some doubt that the rationale of *Notari* remains viable nearly two decades later. Although the Court could supply a lengthy explanation of how it believes *Notari* anticipated what is now an ongoing trend away from the formalistic and presumption-based

1. <u>Performance evaluation</u>

Ms. Kenfield alleges that she was discriminated against on the basis of her race when her performance evaluation was downgraded from an overall rating of 3 to a rating of 2.[2]  Although the Court construes the facts of this claim in the light most favorable to Ms. Kenfield, it begins its analysis by first examining the <u>Department</u>'s version of events.

The Department explains that, in 2006, Ms. Dillion, the Section Chief, instructed supervisors that no employee was to be ranked at an overall rating of 3 without Ms. Dillon's approval.  Nevertheless, Ms. Charter, Ms. Kenfield's immediate supervisor, ranked two employees under her – Nancy Wolff and Ms. Kenfield – with an overall score of 3.  (Ms. Wolff s also white.)  As Ms. Charter's supervisor, and acting consistent with Ms. Dillon's instructions, Ms. Bruce requested that Ms. Charter provide justification supporting the ratings for Ms. Kenfield and Ms. Wolff.  Ms. Charter's submission for Ms. Wolff listed various ways in which Ms. Wolff had repeatedly exceeded expectations.  However, her submission with regard to Ms.

---

*McDonnell-Douglas* analysis and toward a simpler and more flexible "pretext-focused" analysis, *see generally Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43 (2000) (explaining that any presumption derived from the *McDonnell-Douglas prima facie* case drops away upon the employer's proffer of a non-discriminatory explanation for the adverse action, leaving only questions of pretext to be decided) – one in which a heightened showing by reverse-discrimination plaintiffs is unnecessary – it is not necessary to do so to fully address the issues raised in this case.  As the discussion *infra.* demonstrates, the Court finds that Ms. Kenfield's claims fail for different reasons, and thus, the Court need not reach the question of whether she made an adequate showing of reverse discrimination under *Notari*.

[2]An overall rating of "3" reflects "the accomplished performers who consistently exhibit the desired competencies . . . while frequently exceeding expectations," and an employee who "has a documented impact beyond the regular assignments and performance objectives."
An overall rating of "2" reflects "a range of expected performance," "employees who exhibit competency in the work behaviors," and "employees [who] are meeting all the expectations [and] standards [of the job] and, on occasion, may exceed them."

Kenfield was more limited: Ms. Charter noted only that Ms. Kenfield had been assigned more advanced ("lead worker") duties and had been performing them "at the expected level," that Ms. Kenfield had exceeded the number of work units expected of her by 41%,[3] and that Ms. Kenfield had assigned herself extra work during periods of short staffing.  At the same time, Ms. Charter's evaluation also contains some veiled criticisms.  It notes that Ms. Kenfield "likes to figure out how to do something on her own," but "this may have caused her professional growth to falter." Ms. Charter also states that, somewhat backhandedly, that if Ms. Kenfield had "higher needs" for supervision, she "would have received more supervisory attention and learned more skills necessary for growth as a lead worker."  Based on these submissions, Ms. Bruce agreed with Ms. Charter that Ms. Wolff's overall evaluation score should remain a 3, but that Ms. Kenfield's score should be reduced to a 2.[4]

Ms. Kenfield's version of the facts does not fundamentally contradict any of the foregoing, but does attempt to place her own evaluation in a different light.  Ms. Kenfield argues in extensive detail that her evaluation by Ms. Charter must be assessed mindful of the fact that Ms. Kenfield had assumed duties above her job title – "lead worker" or "HP IV" responsibilities, and Ms. Charter evaluated her based on standards that would apply to a full-time lead workers, rather than evaluating her using standards that were applicable to Ms. Kenfield's actual

---

[3]The Department contends that this figure reflects a distorted view of reality and states that the means by which work units were measured was later adjusted.

[4]The Department also points out that Ms. Bruce gave Ms. Kenfield a 3 rating on her performance evaluation for 2007.  Although that evaluation came after Ms. Kenfield filed a charge of discrimination against Ms. Bruce, Ms. Kenfield's own affidavit acknowledges that her 2004-05 performance evaluation, signed by Ms. Bruce, rated her as a "commendable" employee a single point shy of being a "peak performer."  This evaluation occurred prior to any allegation of discrimination by Ms. Kenfield.

designated job category (HP III).  (To put it more succinctly, Ms. Kenfield argues that an HP IV

employee who performs HP IV work to an expected level might warrant a 2 ("meets

expectations") rating, but an HP III that performs the more challenging HP IV work to the

expected level should receive a 3 ("exceeds expectations") rating.)   Although there is some

dispute between Ms. Kenfield and Ms. Bruce as to the proper classification of that tasks Ms.

Kenfield refers to as "lead worker" tasks – Ms. Bruce believing that those tasks were HP III, not

HP IV, tasks – the Court takes the evidence in the light most favorable to Ms. Kenfield and finds

that Ms. Bruce was aware that Ms. Kenfield was performing lead worker tasks during the

evaluation period.  Even so, Ms. Bruce had expressed an expectation to Ms. Charter that Ms.

Kenfield "would be able to do everything that Ms. Charter could do [*i.e.* HP V-level work] and

that she hadn't."  Ms. Charter believed that it was "unrealistic for a work leader to do what a

supervisor does."  As to the comparison between Ms. Kenfield and Ms. Woff, Ms. Kenfield

points out that Ms. Wolff was designated an HP IV employee, and thus, was not subject to the

same evaluation standards as Ms. Kenfield.

The Court finds that Ms. Kenfield has failed to establish a *prima facie* case of

discrimination as it relates to her 2006 evaluation for several reasons.  First, the Court turns to

the question of whether Ms. Kenfield's downgrade in her overall score constitutes an "adverse

action."  In the 10th Circuit, an adverse employment action is defined by example: it includes

"significant change[s] in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a significant

change in benefits"; it does not include "a mere inconvenience or alteration of job

responsibilities." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007); *see also KacKenzie v.*

*City & County of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005) ("while adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action").  It is difficult to see how a performance evaluation that rates an employee as satisfactory or better – as an overall rating of 2 represents here – could amount to an adverse employment action.  *See e.g. Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir. 1994).

This is not to say that a negative performance evaluation can never constitute an adverse action – if the evaluation carries "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects," it might rise to the level of an adverse action.  *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1239 (10th Cir. 2004).  Here, Ms. Kenfield's brief argues that her downgraded evaluation "carried with it the potential for denial of a bonus . . . under state pay for performance" rules, but she does not cite to any evidence establishing this proposition.[5]   A party opposing summary judgment may not rest on assertions of fact made in a brief; the party must support each assertion with citation to evidentiary material that establishes

---

[5]Ms. Kenfield's affidavit states that "the change from a #3 level to a #2 level caused me to lose pay," although she does not elaborate.  As best the Court can tell, the "lose pay" remark is connected to the sentences that immediately follow in the affidavit: "a rating of 3 <u>could</u> have entitled me to a bonus for performance <u>if pay for performance was funded</u>.  It is my understanding that under pay for performance, evaluations of 3 and 4 would entitle an employee to a bonus, while a rating of 2 would not <u>necessarily</u> get an employee a bonus."  (Emphasis added.)

Thus, the downgrade in Ms. Kenfield's evaluation score <u>might</u> have resulted in a tangible loss in pay to Ms. Kenfield, but only if two contingencies were met: (i) the pay for performance plan was funded, and (ii) a rating of 2 was found to be insufficient to warrant a bonus.  Ms. Kenfield does not contend that both of these contingencies were satisfied.  The Court is not aware of, and Ms. Kenfield certainly does not cite to, authority for the proposition that an employment decision that would result in tangible consequences only if certain future contingencies come to pass can be considered an adverse action where those contingencies do not occur.

that fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Accordingly, the Court finds that Ms. Kenfield has not shown that her downgraded performance evaluation constituted an adverse employment action.

Even assuming that the evaluation constituted an adverse employment action, the Court would nevertheless find that Ms. Kenfield has not demonstrated that Ms. Bruce downgraded the evaluation's overall score in "circumstances giving rise to an inference" of race discrimination. Among the types of showings that would satisfy this element are "actions or remarks by decisionmakers that could be viewed as reflecting a discriminatory animus," "preferential treatment given to employees outside the protected class," "a pattern of recommending the plaintiff for positions for which she is not qualified [or] failure to surface plaintiff's name for positions for which she is well-qualified," and, generally, "the timing or sequence of events leading to" the adverse action. *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005).

Although it is abundantly clear that Ms. Kenfield believes the downgrading of her score was unwarranted and unfair, she offers very little to suggest that the reason it was done by Ms. Bruce because Ms. Kenfield is white. Ms. Kenfield's submission on this issue is not specific to the performance evaluation issue; rather, a large portion of her brief is devoted to arguing for an inference that Ms. Bruce harbors racial prejudice based on general events occurring in the Department. Because each of Ms. Kenfield's claims of race discrimination rely upon this same set of conduct in order to draw an inference of discrimination, the Court takes a moment to group Ms. Kenfield's allegations into categories and address each in turn.

First, Ms. Kenfield alleges that Ms. Bruce made statements having racial overtones. Having reviewed the entirety of Ms. Kenfield's brief and supporting evidence, the Court has

located six instances in which Ms. Bruce allegedly made a comment having some racial element. First, Ms. Kenfield recites that in "a training class given by Ms. Bruce . . a racial situation was brought up and Ms. Bruce related to the group about a situation of little white girls throwing rocks at a black child." Ms. Kenfield's recollection that Ms. Bruce "indicated that that happened to her," although the record does not reflect anything further regarding the content of that story nor the meaning that anyone, including Ms. Kenfield, took from it. Second, Jennett Ray, Ms. Kenfield's sister and co-worker, testified that she overheard Ms. Bruce tell another black employee at a Christmas party something to the effect of "let's show them how we really dance, how we can move," apparently referring to black women. Third, Marissa Osborne-Wells, a black co-worker, testified about attending a Black Health Collaborative meeting in 2009 with Ms. Bruce. At that function, Ms. Bruce stated to Ms. Osborne-Wells that "I can't believe how many white people we had turn out for this," a comment Ms. Osborne-Wells considered "weird." Asked during her deposition to explain why she thought the comment was inappropriate, Ms. Osborne-Wells explained that "just because it's called Black Health Collaborative doesn't mean it is just opened to African-Americans." Fifth, Ms. Osborne-Wells related an incident in which she was at a social gathering with Ms. Bruce, and the discussion turned to Ms. Osborne-Wells' Carribean heritage. Referring to the Carribean, Ms. Bruce stated "they don't have that many nonblacks there," and when Ms. Osborne-Wells asked if Ms. Bruce had ever been, she replied "no, but most of the islands, they're usually African-American." The sixth and final statement allegedly made by Ms. Bruce with racial significance occurred with Ms. Ray accidentally called Ms. Bruce by the name of another black employee. According to Ms. Ray, Ms. Bruce stated something to the effect that "it was prejudice or racist to call somebody the wrong name just

because they're the same color."

None of these statements, individually or as a whole, contribute towards any inference that Ms. Bruce harbored any prejudice against white employees.  At best, the statements reflect only the fact that Ms. Bruce is cognizant of racial differences and perceptions.  But an individual's recognition that racial differences exist does not permit an inference that the individual therefore harbors prejudicial beliefs about other races.  Title VII does not prohibit any acknowledgment whatsoever of race or racial differences in the workplace; it merely prohibits employers from acting on the basis of racial prejudices or animus.  Because none of the cited statements permit an inference that Ms. Bruce harbored prejudicial beliefs relating to white employees, none of the comments lend support to Ms. Kenfield's race discrimination claims.

Next, Ms. Kenfield points out that numerous white employees had conflicts with Ms. Bruce.  Ms. Kenfield offers roster of white individuals who left the Department due, in part or whole, to "problems with" or "abuse by" or being "demeaned by" Ms. Bruce.  Beyond the mere fact that each of these employees was white, Ms. Kenfield points to nothing that would indicate that Ms. Bruce was abusive or demeaning to these individuals <u>because</u> of their race.  Interpersonal friction may result from racial prejudice, but they are just as likely (if not more so) to result from personality conflicts, disagreements concerning the quality or quantity of work being produced, communication styles, or any of a host of other factors having nothing to do with racial prejudice or animus.  Indeed, several of the white employees identified by Ms. Kenfield expressly <u>denied</u> a belief that racial differences motivated Ms. Bruce's treatment of them.  Sue Prezekwas, whom Ms. Kenfield alleges was so "abused" by Ms. Bruce that she was forced to leave the unit, testified that "it didn't cross my mind" that there might have been "a

racial component in the way Ms. Bruce treats certain white people."   Ms. Charter, whom Ms. Kenfield also contends was forced out of the unit because of adverse treatment by Ms. Bruce, was asked whether she "perceive[d] or [had] a feeling that [Ms. Bruce] treated people of colors or African-Americans different or better than she did certain White people," to which Ms. Charter responded "no."

The mere allegation that a number of white employees felt alienated by Ms. Bruce's behavior does not assist Ms. Kenfield in demonstrating circumstances giving rise to an inference of discrimination.  As one court has explained, "workplaces are not always harmonious locales," and "complaints premised upon rude treatment, . . . callous behavior by one's superiors, or a routine difference of opinion or personality conflict with one's supervisor are not actionable under Title VII."  *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008).  More to the point, a supervisor may be a despot without also being a racist.  Although the Court accepts that Ms. Bruce may have been difficult for some employees to work with, without some evidence to suggest that racial animus was the reason for that difficulty, the mere fact that conflicts arose between Ms. Bruce and some white employees does not permit an inference of discrimination to be drawn.

Ms. Kenfield offers some vague evidence that indicates that some people believed Ms. Bruce treated white and non-white employees differently.  Ms. Kenfield's own affidavit offers mostly conclusions: "Ms. Bruce's attitude towards certain employees, particularly white employees, was confrontational, demeaning and abusive at times"; in interactions with white employees, "she appeared, at times, to be confrontational and demeaning [but] she generally did not treat people of color in the same negative fashion"; and "I saw a difference in treatment

between whites and non-whites."  Ms. Kenfield goes on to state "what I saw in Ms. Bruce was a person who in one setting might be congenial, but at other times would switch her behavior and be hostile, abusive, and confrontational toward white employees to show them who was the boss, or who was superior[;] I perceived it as a racial issue."

The only other witness offered by Ms. Kenfield who specifically attributes Ms. Bruce's conduct to racial animus (as opposed to Ms. Bruce's personality or some other cause) is Ms. Ray, Ms. Kenfield's sister and co-worker.   (as opposed to individuals who simply believed Ms. Bruce was hostile or abusive but without opining that racial  Ms. Kenfield also offers observations from Ms. Ray, her sister and co-worker.  Ms. Ray's testimony offered many conclusions, but few specifics.  Although she observed Ms. Bruce and Ms. Kenfield interacting approximately once a week, Ms. Ray cannot recall anything about these interactions other than the fact that Ms. Bruce was "rude" to Ms. Kenfield "all the time."  Asked to explain how she reached that conclusion, Ms. Ray could only recall that Ms. Bruce had "a very stern look on her" and "seemed very cold," and Ms. Ray could not recall any rude words Ms. Bruce actually used. Asked to address interactions in which Ms. Bruce treats white and non-white people differently, Ms. Ray testified that "the overall tone of what she talks to you, her body language . . . she jokes around and will talk and be friendly to people of color."  When asked if Ms. Bruce would "joke and talk around with people who are white," Ms. Ray replied that "I'm sure there's people that she has, yes, but that's what I see.  Majority, she's just kind of cold."  Ms. Ray acknowledged that Ms. Bruce is not "cold" with all white people and that "I've seen her be nice to a couple." Mr. Ray testified she had never seen Ms. Bruce be "cold" or refuse to "joke around" with people of color.  Asked to describe the differences in Ms. Bruce's body language when dealing with

white people and when dealing with non-whites, Ms. Ray explained that, with whites, Ms. Bruce had "very straight face, a very firm face, no smile, just comes off pretty cold, kind of abrupt in the way of, you know, talking ."  Asked to describe the tones of voice Ms. Bruce used with her sister and with Yessinia Mendez, a Hispanic employee,[6] Ms. Ray describes Ms. Bruce's tone with her sister to be "very just kind of abrupt, kind of scolding – not nice, not gentle, just kind of stern," while with Ms. Mendez, "there was cheer in her voice, it was lighter, it wasn't stern. There was actually a smile on [Ms. Bruce's] face.  Her voice was just lighter and kind of, I guess, more cheerful."  Mr. Ray simply concluded that Ms. Bruce "was friendlier to people of color than to those that were white."

Taken as a whole, these facts fail to give rise to an inference that the actions taken by Ms. Bruce against Ms. Kenfield are the result of racial discrimination.  The mere fact that Ms. Bruce was "stern," "cold," and "confrontational" in interactions with some white people some of the time, but was always observed to be "friendly" and "gentle" with non-whites is not evidence that Ms. Bruce harbored any racial animus against white people in general, or Ms. Kenfield in particular.  Ms. Kenfield's argument on this issue appears to mistakenly treat "friendliness" and "prejudice" as oppositional states, such that the absence of one demonstrates the presence of the other.  Such an inference is unreasonable.  A supervisor can certainly be stern, cold, or confrontational with some employees of a particular race without harboring any prejudice against that race; indeed, a supervisor who is dissatisfied with certain employees' performance or who has a personal (non-prejudicial) dislike of the employees would very likely be cold and stern in her interactions with those employees, yet without ever harboring racial animus towards

---

[6]Ms. Kenfield appears to equate "hispanic" with "non-white."

them.  In this regard, the observation that Ms. Bruce was cold and stern with some white employees provides no more basis to infer discriminatory animus than does the fact that several white employees quit or resigned as a result of her "abusive" conduct.

Admittedly, a person with racial prejudices might very well be cold and stern with people of the disliked race.  But this observation merely serves to highlight the highly ambiguous nature of Ms. Kenfield's proof, which in turn demonstrates why that evidence, without more, is insufficient.  The intuitive leap from "unfriendly" to "prejudiced" is simply too large to be made unassisted.  If Ms. Kenfield was able to produce other evidence that pointed towards Ms. Bruce's racial animosity or prejudice against whites, evidence that Ms. Bruce was also unfriendly or confrontational with white employees might be sufficiently corroborative that the combination of those items of evidence permitted an inference of discrimination.  But without the assist offered by other evidence of prejudice – and Ms. Kenfield has simply offered none – the mere contention that a supervisor was cold, confrontational, or unfriendly with some white employees (but no non-white employees) is simply insufficient to permit an inference of discrimination.

Finally, Ms. Kenfield appears to contend that Ms. Bruce's animus can be inferred from the fact that the Department was in violation of several aspects of state personnel rules.  For example, Ms. Kenfield contends that forcing her to perform "lead worker" tasks for an extended period of time without upgrading her to an HP IV classification was prohibited, yet Ms. Bruce either caused or allowed it to occur.  Obviously, the mere fact that Ms. Bruce may have made decisions in violation of state personnel rules or procedures provides no basis to assume that the decision was racially-motivated.  At best, it merely suggests that Ms. Kenfield was free to seek relief for that unlawful decision from the appropriate state agency.

Having thus canvassed the entirety of the evidence that Ms. Kenfield offers as circumstantial proof of Ms. Bruce's discriminatory motives, the Court finds that the evidence, even when taken as a whole, is too thin to permit such an inference.

As noted above, the "circumstances giving rise to an inference of discrimination" element of the *prima facie* case can also be established by showing that the employer gave more favorable treatment to a similarly-situated employee outside of Ms. Kenfield's protected class – *i.e.* a non-white employee. Ms. Kenfield does make an allegation that Ms. Mendez, another HP III employee, was treated more favorably by Ms. Bruce than she was. Ms. Mendez's 2006 annual evaluation, which Ms. Bruce approved without comment, awarded Ms. Mendez an overall rating of 3. There is surprisingly little discussion by either party about Ms. Mendez's evaluation. The document in the record appears to indicate that Ms. Mendez's evaluation was completed by her supervisor, Gary Laura. Neither party has addressed the question of whether the directive from Ms. Dillon, the Section Chief, that no evaluations with an overall score of 3 be permitted without her approval applied to Ms. Mendez as well, and nothing in the Court's review of the record indicates that any of the witnesses were asked to discuss the issue.

The Court finds that the mere fact that a non-white employee was not downgraded on her evaluation when Ms. Kenfield was is not sufficient to give rise to an inference of discrimination. As cases like *Plotke* explain, an inference may arise when "similarly-situated" individuals are treated differently, but the particular circumstances of this claim make it difficult to assess whether Ms. Kenfield and Ms. Mendez were indeed "similarly-situated." To be "similarly-situated" for purposes of creating an inference of discrimination, not only must the employees deal with the same supervisor and be subject to the same standards regarding performance

evaluation and discipline, *Riggs v. Air Tran Airways, Inc.*, 497 F.3d 1108, 1120 (10th Cir. 2007), the court must also "compare the relevant employment circumstances." *Aramburu v. Boeing Corp.*, 112 F.3d 1398, 1404 (10th Cir. 1997).

Here, even assuming that Ms. Kenfield and Ms. Mendez were similarly-situated with regard to job titles, responsibilities, evaluation criteria, and even supervision – insofar as Ms. Bruce reviewed the evaluations of both women completed by their immediate supervisors – the fact remains that it is impossible to assess whether they are "similarly-situated" for purposes of determining whether a downgrade of their evaluation scores was warranted. It is clear from reviewing the two evaluations that many of the criteria by which employees are assessed are inherently subjective. Thus, the Court cannot say with assurance that Ms. Kenfield's performance was similar to that of Ms. Mendez, such that both women should have received the same overall score. Ms. Kenfield may believe that her performance was as good as, if not better than, Ms. Mendez's but Ms. Kenfield's own subjective perception of her performance is irrelevant in the disparate treatment analysis. *Tran v. Trustees of State Colleges*, 355 F.3d 1263, 1270 (10th Cir. 2004). Rather, it is only Ms. Bruce's subjective perception that matters and, without some evidence that Ms. Bruce harbored a subjective belief that Ms. Kenfield and Ms. Mendez's performance was similar (and no such evidence has been adduced), yet only Ms. Kenfield's score was downgraded, Ms. Kenfield has not demonstrated circumstances giving rise to an inference of discrimination.

Accordingly, the Department is entitled to summary judgment on Ms. Kenfield's claim relating to her performance evaluation.

2. Promotion to HP IV

Ms. Kenfield next complains that the failure to promote her to an HP IV position in November 2006 was the result of race discrimination.

Ms. Kenfield explains that in or about September 2004, Nancy Wolff's transfer to another position left Ms. Kenfield's department without a "lead worker" – essentially an HP IV position.  At the urging of her supervisor, Ms. Charter, Ms. Kenfield agreed to assume <u>some</u> of the lead worker duties, and beginning in Spring 2005, Ms. Kenfield performed <u>all</u> of the lead worker tasks.  At that time, Ms. Kenfield spoke to Ms. Charter about the possibility of a formal promotion to HP IV.  According to Ms. Kenfield's affidavit, Ms. Charter discussed the matter with her supervisor – then, Nancy Spencer (Ms. Bruce's predecessor) – and was authorized "to explore a promotion to HP IV for me and commit to such a promotion as soon as possible." (From this point onward, Ms. Kenfield's affidavit repeatedly asserts that Ms. Charter, on behalf of the Department, had given a her a "commitment" to a promotion.)  However, Ms. Charter was instructed by Human Resources that Ms. Kenfield would have to wait at least a year before such a promotion could be made, even though Ms. Charter believed she could shorten that period.

Ms. Spencer resigned in December 2004, and was replaced by Ms. Bruce.  Ms. Kenfield continued to perform lead worker tasks under, and with the approval of, Ms. Bruce.  In April 2005, Ms. Charter began formally seeking to have Ms. Kenfield promoted to HP IV.  Ms. Kenfield alleges that, as her promotion to HP IV was being circulated for funding approval, Ms. Bruce stopped the process, but Ms. Kenfield's affidavit does not elaborate on the reasons why. (Ms. Kenfield does not appear to contend that this action by Ms. Bruce was unwarranted or discriminatory.)  Instead, Ms. Bruce recommended additional training for Ms. Kenfield to be accomplished by December 2006.  In April 2006, Ms. Charter resigned and Rebecca Jordan

became Ms. Kenfield's direct supervisor.  Ms. Kenfield reminded Ms. Jordan of the

representations that had previously been made concerning her promotion to HP IV, and in

September and October 2006, Ms. Kenfield and Ms. Jordan met to discuss developing another

formal application for the promotion.

At some point in October 2006, the decision was made to move Ms. Mendez, whom Ms.

Kenfield alleges was a particular favorite of Ms. Bruce's,  from an outlying office to the Denver

office where Ms. Kenfield worked.  As another HP III, Ms. Mendez would have come under the

direct supervision of Ms. Kenfield if Ms. Kenfield had thereafter been promoted to HP IV.  On

November 9, 2006, Ms. Bruce announced that there would be no lead worker/HP IV positions

and thus, no promotion for Ms. Kenfield.  Instead, Ms. Kenfield's lead worker duties would be

split between Ms. Kenfield and Ms. Mendez.  Ms. Kenfield viewed this decision as "a clear

signal . . . that an advancement opportunity had been taken from me and that there appeared to be

a plan to advance Ms. Mendez, rather than myself."  Ms. Kenfield was particularly put off by the

fact that Ms. Mendez had not been performing the same types of lead worker tasks that Ms.

Kenfield had been doing since 2004.

The Department's version of the circumstances surrounding Ms. Kenfield's (non-)

promotion does not dispute most of the facts alleged by Ms. Kenfield; rather, it approaches the

situation from a different perspective.  The Department points out that Ms. Kenfield's

department did not have a HP IV-level employee throughout Ms. Bruce's tenure.  Ms. Bruce

recognized that Ms. Charter was responsible for supervising more people than supervisors in

other sections.  Although Ms. Bruce represents in an affidavit that she "was not opposed to the

idea of recommending the creation of a [HP IV] lead worker," Section Chief  Dillon, "told me

she did not feel Ms. Charter needed a lead worker."  Nevertheless, Ms. Dillon "acknowledged the inequity in supervision" in Ms. Charter's division and asked Ms. Bruce "to present her with options for restructuring the division to address the inequity."  Ms. Bruce states that although some of the "lead worker" duties that Ms. Charter had assigned Ms. Kenfield to perform had, in the past, been performed by an HP IV employee, Ms. Bruce did not consider those duties to be "exclusively designated as HP IV level duties."  Both Ms. Bruce and Ms. Dillon agreed that Ms. Kenfield's duties, including those she considered to be lead worker tasks, were consistent with her classification as HP III.

In 2006, Ms. Bruce and Ms. Dillon had discussions about restructuring the office, in part to address supervisory inequity.  Eventually, they decided to restructure the office by creating an opening for a third HP V supervisor and to realign the assignments to the two existing HP V supervisors (then Ms. Jordan and Gary Laura).  According to Ms. Bruce, this restructuring "ruled out the need to create any HP IV positions, meaning that there would be no 'lead workers.'" Rather, the types of duties that were being performed – *i.e.* those that Ms. Kenfield considered "lead worker" tasks and those that Ms. Bruce believes were regular HP III tasks – would continue to be split among the senior, experienced HP III employees, namely, Ms. Kenfield and Ms. Mendez.

The Court finds that, under these facts, Ms. Kenfield has not established a *prima facie* case of discrimination.  Turning first to the question of whether Ms. Kenfield has demonstrated that she suffered from an adverse employment action, the Court pauses to acknowledge a difference in perception and terminology between the parties.  The Department talks of "creating" (or, more accurately, deciding not to create) a new HP IV position, while Ms.

Kenfield views the dispute as one concerning her own "promotion" to HP IV, as a reflection of her history of performing lead worker/HP IV duties despite being an HP III.  These differing characterizations, in turn, inform the parties' positions on the question of whether the November 2006 decision constitutes an adverse employment action.  The Department argues that because it decided not to create a new HP IV position, no employee was adversely affected, because no employee was considered and hired for the (non-existent) position.  The decision, it contends, did not affect Ms. Kenfield's pay, benefits, or significantly alter her responsibilities, nor did it do so to anyone else of any race.  Thus, argues the Department, the decision not to create any HP IV position cannot amount to an adverse employment action.  Ms. Kenfield, taking a more individualized view, believes that the decision did adversely affect her, as she had effectively been "promised" a promotion to HP IV by Ms. Charter and others, and Ms. Bruce's decision deprived her of the enhanced job title (and, it appears, an accompanying pay increase).

This being a disagreement largely of perception, the Court will not attempt to conclusively resolve it and declare whether Ms. Kenfield has or has not alleged an adverse employment action.  Rather, the Court will simply move on to the next inquiry – whether Ms. Kenfield has shown that the November 2006 decision was made by Ms. Bruce in circumstances giving rise to an inference of discrimination.  Once again, Ms. Kenfield's proof on this element is insufficient.

As discussed previously, Ms. Kenfield has not come forward with evidence of racially-prejudicial comments by Ms. Bruce, evidence that a similarly-situated non-minority employee was given a promotion to HP IV when Ms. Kenfield was not, nor any other evidence that would warrant an inference that Ms. Bruce's actions were racially motivated.   There is simply not

enough evidence, even when taken in the light most favorable to Ms. Kenfield, to permit a jury to conclude that race discrimination motivated the decision not to promote her to HP IV. Admittedly, Ms. Kenfield has every right to feel disappointed that a promise to promote her by Ms. Charter and others was not honored by Ms. Bruce, but without some evidence to suggest that Ms. Bruce's decision was racially-motivated, Ms. Kenfield's disappointment is not redressible via Title VII.  Similarly, Ms. Kenfield may believe that her performance of lead worker duties entitled her to an HP IV promotion under state employment law rules, but if that is the case, her search for a remedy must be under those rules, not by means of a suit for racial discrimination.

Accordingly, the Department is entitled to summary judgment on Ms. Kenfield's claim relating to the denial of her November 2006 promotion to HP IV.

3. <u>Promotion to HP V</u>

In contrast to the two previous claims, which are discussed in Ms. Kenfield's brief in extensive detail, the facts underlying her claim of race discrimination based on her 2008 EEOC charge are barely referenced.  Ms. Kenfield explains that this claim entails "two components" – "the stripping of job duties and the hostility directed against the Plaintiff and Ms. Mendez' selection for the supervisor position to replace Gary Laura."  (The Court assumes that "stripping of job duties" and "hostility directed against the Plaintiff" are intended to be one collective component.)  Beyond this statement, the brief offers no meaningful discussion of the events underlying this claim; instead, Ms. Kenfield states that these matters "are detailed in [6 specified

paragraphs of her] affidavit . . . and documents attached thereto."[7]

The Court has some doubt that this is sufficient to discharge Ms. Kenfield's obligations as the party with the burden of proof opposing a motion for summary judgment, particularly with regard to that portion fo the claim that contends that Ms. Kenfield was discriminated against as a result of "the stripping of job duties and hostility directed against [her]." Not only does her brief not specifically identify and recite the facts she contends are pertinent to this component of the claim, it offers no meaningful argument as to how Ms. Kenfield believes those facts state a claim for relief. Ms. Kenfield appears to intend that the Court simply review the cited paragraphs of the affidavit, extract those facts that the Court believes are pertinent, and construct an argument on Ms. Kenfield's behalf with regard to those facts. This is not the Court's function.[8] *Adler*, 144 F.3d at 672. In the absence of any meaningful argument regarding "stripping of job duties" and "hostility directed at [her]," the Court finds that Ms. Kenfield has failed to demonstrate a genuine issue of material fact with regard to this portion of her race discrimination claim, and that the Department is entitled to summary judgment on it.

_____

[7]The remainder of this section of the brief is largely devoted to arguing that Ms. Kenfield was a superior candidate to Ms. Mendez for the new HP V position. That issue is addressed *infra*.

[8]In any event, the cited portion of Ms. Kenfield's affidavit does not recite facts that would be sufficient to establish a race discrimination claim premised upon "stripping of job duties" or "hostility directed against [her]." With regard to "stripping of job duties," the affidavit recites that "various duties were stripped from me, including pager functions, review of DIS pouches and what authority I had over DIS workers." Beyond noting that the duties were taken away from her "in a face-to-face meeting" with Ms. Bruce, Ms. Kenfield does not point to anything that would indicate that Ms. Bruce's motivation for doing so was race-based.

Ms. Kenfield recites no specific acts by Ms. Bruce in this portion of the affidavit that could be said to reflect racially-based "hostility" directed towards her. At best, Ms. Kenfield complains that Ms. Bruce did not make any efforts to "mediat[e]" in response to Ms. Kenfield's prior EEOC charge, as Ms. Kenfield had been told would occur.

That leaves Ms. Kenfield's contention that her denial for an open HP V position constituted race discrimination.  The circumstances underlying this claim, too, are not clearly spelled out in Ms. Kenfield's brief, and the following recitation incorporates those allegations in Ms. Kenfield's brief, supplemented by assertions by the Department for which Ms. Kenfield has not adduced contrary evidence.  In September 2007, Mr. Laura, then Ms. Kenfield's supervisor, left the unit, leaving an opening at the HP V level.  After posting the job and receiving applications, Human Resources selected Ms. Kenfield, Ms. Mendez, and Pam Montoya (who is Hispanic) as finalists for the position by Human Resources.   Ms. Kenfield states that Mr. Laura "confided in [her] that the selection was a done deal and that Ms. Mendez would get the position."[9]  Screening and interviews were conducted by Ms. Bruce and Ms. Jordan, one of the other HP V supervisors.  At the conclusion of the process, both Ms. Bruce and Ms. Jordan concluded that Ms. Mendez was the superior candidate, and the job was given to her.

Ms. Kenfield's race discrimination claim with regard to this promotion fails for the same reason that her other race discrimination claims have.  In short, Ms. Kenfield points to no meaningful evidence to even warrant an inference that the decision to give Ms. Mendez the HP V position over her was infected with racial animus.[10]  Certainly, there is evidence to suggest

---

[9]Ms. Kenfield states that, by this time, Ms. Bruce had already appointed Ms. Mendez as the acting supervisor, although the record appears to reflect that Ms. Kenfield was preparing to start a maternity leave at this point in time, and thus, Ms. Bruce had assigned any duties that Ms. Kenfield would have been performing to Ms. Mendez.

[10]Ms. Kenfield's task in proving animus in conjunction with the HP V promotion is made more difficult by the undisputed fact that the decision to hire Ms. Mendez over her was made jointly by Ms. Bruce and Ms. Jordan.  Ms. Kenfield makes no suggestion that Ms. Jordan shared Ms. Bruce's alleged racial animus, yet Ms. Jordan agreed with Ms. Bruce that Ms. Mendez was the superior candidate.

that Ms. Bruce had conflicts with, and may have even personally disliked, Ms. Kenfield, and evidence that Ms. Bruce favored Ms. Mendez.  Indeed, Ms. Kenfield may even be correct that Ms. Bruce prejudged the merits of the candidates for the HP V opening, deciding to give Ms. Mendez the job before the entire application process had been completed.  But Ms. Kenfield has come forward with noting more than conjecture to establish that Ms. Bruce's preferences for or against certain persons were the result of racial prejudice, as opposed to benign explanations like personality differences or working styles.

Nor does Ms. Kenfield carry her burden by arguing that she was a better choice for the position than Ms. Mendez.  Courts are extremely reluctant to second-guess personnel decisions made by employers under the guise of reviewing discrimination claims, particularly where the employer is called upon to make subjective choices from among candidates with similar qualifications.  *See Jaramillo v. Colo. Judicial Dept.,* 427 F.3d 1303, 1308-09 (10th Cir. 2005). Thus, "minor" differences between competing employees are not sufficient to demonstrate discrimination; to permit such a finding, the disparity between the qualifications of the rejected employee alleging discrimination and the employee that was selected for the position must be "overwhelming[ly]" in favor of the rejected employee.  *Id.*  Here, the evidence does not demonstrate that Ms. Kenfield's qualifications were "overwhelmingly" superior to those of Ms. Mendez for the HP V job, particularly insofar as Ms. Mendez had also been successfully performing supervisory lead worker duties before her selection.

Accordingly, the Court finds that the Department is entitled to summary judgment on Ms. Kenfield's race discrimination claim in its entirety.

### C.  Retaliation

25

Finally, Ms. Kenfield asserts a claim for retaliation, alleging that Ms. Bruce engaged in adverse actions motivated by the fact that Ms. Kenfield has filed an grievance against her in November 2006.[11]  Ms. Kenfield alleges that this retaliation took a variety of forms: "her supervisor and Ms. Bruce bec[ame] hostile," her supervisor "did not prepare . . . and submit" a request for a promotion for Ms. Kenfield for doing lead worker duties," the "stripping of job duties" discussed above, and, finally, the refusal to award her the HP V opening.

To establish a claim for retaliation under Title VII, Ms. Kenfield must first establish a *prima facie* case by showing: (i) she engaged in a protected activity; (ii) she suffered an adverse employment action; and (iii) there is a causal connection between the adverse action and the protected activity.  *Haynes v. Level 3 Communications LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006).  If Ms. Kenfield carries that burden, the Department must articulate a non-retaliatory reason for the adverse action and Ms. Kenfield must prove that the proffered reason is false and

---

[11]Ms. Kenfield's brief is somewhat unclear, alleging in one instance that she believes the protected conduct was the grievance filing, and in another instance arguing that both the grievance and her January 2007 filing of an EEOC charge constitute protected conduct.  The Court restricts its analysis to the November 2006 grievance.  Both the grievance and EEOC charge contained effectively identical allegations that Ms. Bruce had engaged in race discrimination.  Thus, to the extent Ms. Bruce would have been motivated to retaliate against Ms. Kenfield because of the accusations in the EEOC charge, that same motivation would have been present two months earlier, when Ms. Kenfield first leveled those same allegations in an internal grievance against Ms. Bruce.

On somewhat similar facts, the Supreme Court in *Clark County School Dist. v. Breeden*, 532 U.S. 268, 272-73 (2001), measured temporal proximity by the 20-month period between an employee's filing an EEOC charge and the employer's adverse action, and not, as the employee requested, by the three-month period between the employer's receipt of a right-to-sue letter from the EEOC and the adverse action.  "[I]f one presumes [the employer] knew about [the right-to-sue letter]," the Court wrote, "one must also presume that [it] knew almost two years earlier about the protected action (filing of the EEOC complaint) that the letter supposedly disclosed."  *Id.*  By the same logic, if Ms. Kenfield assumes Ms. Bruce knew about the EEOC charge in January 2007, one must also assume that Ms. Bruce knew about the same allegations against her in the November 2006 grievance as well.

retaliation is the true reason.  In the retaliation context, the definition of "adverse action" is broader than that in the disparate treatment context; any act by the employer that would have dissuaded a reasonable employee from making or supporting a charge of discrimination can constitute an adverse action for retaliation purposes.  *Burlington Northern & Santa Fe RR Co. v. White*, 548 U.S. 53, 67-68 (2006).

The Court has some doubt that some of Ms. Kenfield's alleged acts of retaliation rise to the level of an adverse action, even under the more relaxed standard applicable to retaliation claims.  Ms. Bruce allegedly becoming "hostile" towards her and her supervisor (presumably Ms. Jordan, having replaced Ms. Charter) failing to seek a promotion of Ms. Kenfield to HP IV do not constitute adverse actions for retaliation purposes.  Notably, these events occurred before[12] before Ms. Kenfield filed her grievance in November 2006, yet they did not dissuade Ms. Kenfield from filing an EEOC charge two months later.  To the extent they continued to occur after Ms. Kenfield filed her charge, the Court can hardly say that these actions were "caused" by Ms. Kenfield's filing of a charge when they were already occurring prior to that charge and merely continued.

That leaves Ms. Kenfield's contention that her job duties were taken away and she was

---

[12]Ms. Kenfield has alleged that Ms. Bruce was already hostile and unfriendly to her prior to the November 2006 grievance.  Although Ms. Kenfield alleges that Ms. Bruce became "more hostile" after that charge was filed, she does not recite facts that demonstrate a significant adverse change in Ms. Bruce's treatment of her.  Ms. Kenfield alleges that, after learning that she had accused Ms. Bruce of racism in the grievance, Ms. Bruce "looked at me in a way that was quite chilling and made a statement to the effect that 'you think its unfair.'" Ms. Kenfield inferred from this single statement that "the environment would become more hostile," although she asserts no facts to suggest a material change.  Ms. Bruce continued to "give [her] the cold shoulder and in meetings her body language was hostile," although Ms. Kenfield has contended that Ms. Bruce behaved that way prior to the filing of the grievance as well.

denied the promotion to HP V, both as retaliation for her protected conduct in late 2006.  To prove that these acts were causally connected to her protected conduct, Ms. Kenfield has the option of either relying upon close temporal proximity between the protected act and adverse action, or by coming forward with other evidence warranting an inference of causation. Temporal proximity will suffice to demonstrate causation only when the period between protected conduct and adverse action is a matter of days or weeks; a one-and-one-half month delay might be sufficient to permit a finding of causation, but a three-month period is insufficient, of itself, to do so.  *Haynes*, 456 F.3d at 1228, *citing Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

Turning first to the question of whether the removal of certain job duties from Ms. Kenfield can be said to have a causal connection to her protected conduct, the Court must first identify what duties were withdrawn, by whom, and when.  Ms. Kenfield lists three functions that were taken away from her after the filing of her EEOC charge: pager functions, review of DIS pouches, and "authority . . . over DIS workers."  Ms. Kenfield alleges that "it was [Ms. Bruce] who took away these duties . . . in the spring of 2007."  That action can be located more precisely in time insofar as Ms. Kenfield refers to an e-mail to Mr. Laura that she composed about the meeting where Ms. Bruce took away the job functions.  That e-mail is dated April 9, 2007, and references "the meeting with [Ms. Bruce] on Friday," which would mean the meeting occurred on April 6, 2007.  Thus, Ms. Kenfield's November 2006 grievance was filed some five months prior to Ms. Bruce's decision to reassign some of her job duties, preventing any inference of causation based solely on temporal proximity.

Without the benefit of temporal proximity, Ms. Kenfield must come forward with some

other evidence suggesting that Ms. Bruce's decision to remove certain job functions was caused by Ms. Kenfield's grievance.  Ms. Kenfield does not offer any additional evidence to that effect, and thus, the Court finds that the Department is entitled to summary judgment on her claim that the removal of her job duties was retaliatory.

The same reasoning applies with even more force to Ms. Kenfield's claim that the denial of the HP V promotion in September 2007 was retaliatory.  This adverse action occurred roughly ten months after Ms. Kenfield's grievance, meaning that she cannot establish causation by simple temporal proximity.  But Ms. Kenfield offers no additional evidence that would demonstrate that the decision to give the promotion to Ms. Mendez was based on Ms. Kenfield's protected conduct nearly a year earlier.  Indeed, if anything, Ms. Kenfield's own allegations undercut any retaliatory inference that one might draw in these circumstances.  Ms. Kenfield states that the very reason she filed the November 2006 grievance was because it appeared to her that "there was "a plan to advance Ms. Mendez."  If that plan was evident to Ms. Kenfield before she even filed the November 2006 grievance, she cannot thereafter assert that the reason Ms. Mendez was selected over her for the HP V opening was because of Ms. Kenfield's grievance.  Rather, that decision would merely be the "plan to advance Ms. Mendez" coming to fruition.  Because that plan existed prior to Ms. Kenfield ever filing the grievance, the selection of Ms. Mendez as part of that plan cannot have been caused by Ms. Kenfield's grievance.

Accordingly, the Department is entitled to summary judgment on Ms. Kenfield's retaliation claim.

## <u>CONCLUSION</u>

For the foregoing reasons, the Department's Motion for Summary Judgment (**# 102**, as supplemented **# 103, 104**) is **GRANTED**.  The Clerk of the Court shall enter judgment in favor of the Defendant on all claims in this action.

Dated this 6th day of September, 2011

**BY THE COURT:**

Marcia S. Krieger
United States District Judge